1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RYAN MICHAEL MORRISON,<br><br>                                    Petitioner,<br><br>v.<br><br>KATHLEEN ALLISON, et al.,<br><br>                                    Respondents. | Case No. 18-cv-1857-MMA (JLB)<br><br>**ORDER DENYING PETITIONER'S MOTION FOR STAY AND ABEYANCE;**<br><br>[Doc. No. 39]<br><br>**DENYING FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS;**<br><br>**AND DENYING A CERTIFICATE OF APPEALABILITY** |

On March 24, 2021, Ryan Michael Morrison ("Petitioner"), a state prisoner proceeding *pro se*, filed a First Amended Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.[1]  *See* Doc. No. 25.  Petitioner challenges his San Diego County

---

[1] Petitioner originally named "Joe Lizarraga" as Respondent because he was housed at Mule Creek State Prison.  *See* Doc. No. 1.  Based on recent filings, however, it appears Petitioner is presently located at the Correctional Training Facility in Soledad, California.  *See* Doc. No. 39 at 9; *see also* Doc. No. 36.  Thus, the Court *sua sponte* **DIRECTS** the substitution of Kathleen Allison, Secretary of the CDCR, as

Superior Court conviction in case number SDC262563 for first degree burglary of an inhabited dwelling during which another person other than an accomplice was present, possession for sale of a controlled substance (methamphetamine), and possession of a controlled substance (heroin), in addition to findings that he had served a prior prison term and had prior felony convictions, for which he was sentenced to 30 years to life in addition to six years and 259 day concurrent sentences.  *See id.*; *see also* Doc. No. 33-1 ("Clerk's Tr.") at 174, 176, 224–26, 232, 234–35.  Petitioner alleges in Claim One that his federal right to due process was violated when the trial court erroneously subjected him to an unauthorized sentence by improperly finding two strikes arose from the same set of circumstances and trial counsel rendered ineffective assistance for failing to discover this error by investigating and obtaining evidence concerning his prior convictions.  *See* Doc. No. 25 at 5–7.  In Claim Two, Petitioner alleges trial counsel rendered ineffective assistance by: (1) failing to investigate and present an affirmative defense to the burglary charge of insanity or lack of competency due to "methamphetamine induced psychosis," *id.* at 18; (2) failing to procure and call a licensed, experienced, and professional expert witness to testify as to that defense, (3) instead calling an inexperienced, unprofessional and unlicensed expert; and (4) failing to call Petitioner's wife to testify about Petitioner's co-defendant taking advantage of Petitioner's condition.[2]  *See id.* at 18–24.

On June 28, 2021, Respondents filed an answer, *see* Doc. No. 32, and thereafter, lodged the relevant state court record, *see* Doc. Nos. 13, 33.  Respondents maintain habeas relief is unavailable because: (1) the ineffective assistance counsel aspect of Claim One is procedurally barred and in any event fails for lack of merit; (2) the trial

---

Respondent in place of "Joe Lizarraga." *See Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 894 (9th Cir. 1996) (stating that the respondent in § 2254 proceedings may be the chief officer in charge of state penal institutions).

[2] In Claim Two, Petitioner again asserts trial counsel failed to investigate and obtain evidence concerning Petitioner's prior convictions, *see id.* at 24, which was also raised, and will be addressed by the Court, as part of Claim One.

court error aspect of Claim One is not cognizable on federal review and even to the extent it is cognizable, the state court rejection of the claim was reasonable and the Court is bound by the state court's interpretation and application of state law; (3) the first three contentions raised in Claim Two are procedurally barred and in any event fail for lack of merit; (4) the fourth contention raised in Claim Two is unexhausted but in any event fails for lack of merit; and (5) to the extent any claims rely on a new rule of constitutional law, relief is precluded under *Teague v. Lane*, 489 U.S. 288, 301 (1989). *See* Doc. No. 32 at 3–5. On August 24, 2021, *nunc pro tunc* to August 20, 2021, Petitioner filed a motion for stay and abeyance in lieu of a Traverse, requesting a suspension of the federal proceedings for the purpose of exhausting state court remedies concerning claims of ineffective assistance of counsel, including the unexhausted Claim Two contention concerning trial counsel's alleged failure to call Petitioner's wife to testify about Petitioner's co-defendant taking advantage of Petitioner's condition. *See* Doc. No. 39.

For the following reasons, the Court **DENIES** the First Amended Petition for a Writ of Habeas Corpus, **DENIES** Petitioner's motion for stay and abeyance, and **DENIES** a Certificate of Appealability.

## I. FACTUAL BACKGROUND

The following facts are taken from the state appellate court opinion affirming the judgment in *People v. Morrison, et al.*, No. D069831 (Cal. Ct. App. Apr. 27, 2017). *See* Doc. No. 13-4. The state court factual findings are presumptively reasonable and entitled to deference in these proceedings. *See Sumner v. Mata*, 449 U.S. 539, 545–47 (1981).

Witness B.L. testified that she has lived in La Jolla, California for about 18 years, including on June 22, 2015, when her house located in a cul-de-sac was broken into while she was at home. On that day, B.L. also had a guest staying in her house, Veronica K.

On the day of the break-in, B.L. got up about 6:00 a.m. and called a friend to inquire if he needed a ride to a medical appointment. Shortly after B.L. hung up the phone, she heard what she described as a "big bang." Initially, B.L. believed the sound was the result of an earthquake. However,

when she heard another loud bang, she realized it was the sound of glass shattering.  B.L. in response opened her window and looked outside. She saw a glass door to her house broken and someone wearing what she described as a dark brown or black "cape" enter her daughter's bedroom.  B.L. called 911. A tape recording of that call was played for the jury.

On the recording, B.L. described hearing noises in her daughter's room, which was located adjacent to her bedroom.  Crying, B.L. whispered to the 911 operator that she was so scared she was shaking; that before she called 911, she heard a man at the glass door say, "'My job is done'"; that she could hear voices having a "conversation" "inside the home," although she could not hear specific words being spoken; that she was "positive" she "heard more than one voice" coming from the inside the house; that she could hear "footsteps and movement" inside the house; and that shortly before police arrived, she heard a "screeching" noise inside the house, which caused her to be concerned for her guest Veronica, as it sounded like somebody was being "strangled, held, crying."

Once police contacted her, B.L. jumped from her bedroom window located over the garage.  The officers caught B.L., who estimated her window was about 10 feet off the ground.  Police escorted B.L. to the front of the house.  B.L. then saw for the first time a silver car parked behind her garage that neither belonged to her nor her guest.  On investigation, police determined the car was registered to Morrison.

Later, after the police had cleared the house, B.L. went back inside with police and saw the double-paned glass door in her daughter's room had been shattered by a rock, with glass covering the room.  On investigation, police found blood droplets on the exterior and interior of the house, suggesting that someone was cut while entering the house through the broken glass door. Subsequent DNA testing by law enforcement showed the likelihood the DNA was from a person other than Morrison was one in 130 sextillion in the Caucasian population.

B.L. testified the rock used to shatter the window came from an area just outside her daughter's door.  An officer later noticed an indentation on the wall opposite the glass door that "matched the rock perfectly," suggesting the rock had been thrown with substantial force.  B.L. also observed that a door near the kitchen/living room had been opened; that the bottom half of the door had been damaged as if someone had "kicked it"; that items had been "shattered" near there as well; and that a water pitcher she kept in the

refrigerator was "splattered" on the living room floor.  Upstairs, near where her guest Veronica was staying, B.L. also found that a closet had been "ransacked."

B.L. later identified several items taken from her house that police recovered from Morrison's car.  This included art paint, a laptop computer, some cords for the computer, several keys to her house and a brown tote bag ostensibly for the laptop.  B.L. noticed there was blood on the tote bag.

Witness Veronica testified she was staying in B.L.'s house on the morning of the break-in.  About 6:00 a.m. that day, Veronica heard noises inside the house.  Initially she heard footsteps, then a noise as if someone was "hitting at something."  A short time later, a police officer called Veronica on her cell phone.  The officer told Veronica to lock her bedroom door and hide.

San Diego Police Officer Phillip Worthington testified he and his partner responded about 6:03 a.m. to a dispatch of a "hot prowl res(idential) burg(lary)" [sic] at B.L.'s house.  On arrival, Officer Worthington saw a dark "plastic bag" covering the rear license plate of a car parked in the driveway.  He also observed a man inside the car, later identified as Morrison.  Officer Worthington saw the man's left hand was bleeding profusely.  A registered nurse, Officer Worthington took Morrison's pulse and found Morrison had an elevated heartrate. Officer Worthington observed Morrison's pupils were dilated and his eyes were "fluttering," both of which further suggested Morrison was under the influence of a controlled substance.  Police later discovered in the car two bags of what appeared to be a controlled substance and a dark "bindle" they suspected contained heroin.

Subsequent analysis of the bindle by a criminalist showed it was in fact 3.2 grams of heroin.  With respect to the two bags, testing on what the criminalist referred to as bag "A" was found to contain 23.85 grams of methamphetamine.  Bag "B," which was found with bag "A" and contained what appeared to be the same crystalline substance, was not tested for methamphetamine.  Bag "B" weighed 17.03 grams, which unlike bag "A," included the outer packaging.  Finally, a third bag found in one of the backpacks belonging to Hewitt was tested and was found to contain 12.92 grams of methamphetamine.

Officer Worthington testified that, after other officers contacted the man in the car, he along with other officers went around back and contacted B.L.  With the help of another officer, Officer Worthington caught B.L. when

she jumped out of her bedroom window.  Once B.L. was safe, police used canine units to search and clear the house.  Shortly thereafter, police apprehended a man hiding in some bushes about a block away from B.L.'s house.  The man was later identified as Hewitt.

Police recovered two backpacks in the immediate area where Hewitt had been found hiding.  In one of the backpacks, police found a paper covered in what appeared to be "fresh" blood.  Inside one of the backpacks, police found, as noted, a bag of a white crystalline substance.  The bag was wrapped in a bloody towel.  Police also found "several small plastic bags" in the backpacks.  Officer Worthington opined the small bags were "commonly found on people who sell controlled substances," as they take a quantity of the drug stored in a large bag and "compartmentalize" the drug into smaller bags for sale.  DNA testing of blood on one of the baggies and the bloody towel matched the DNA of Morrison.

On Hewitt, police found an iPod, two cell phones and a pair of "black and blue mechanic(-)type work gloves" that, based on his training and experience, Officer Worthington opined were frequently used by individuals to "break() into houses and cars."  Officer Worthington testified that one of the phones found on Hewitt was an actual working phone.  When Officer Worthington examined the other phone, he found it had a false cover.  When he opened it, Officer Worthington found a "mini digital scale" with a white crystalline substance on it.

Officer Worthington participated in the search of the silver car.  Inside the car, officers found items belonging to B.L., as noted.  Officers also found inside the car four wigs; a "red" [sic] mask," a "white knitted" mask, a black "ski mask" and a "gas mask"; a "hatchet"; a black bag containing two smaller bags with a "large amount" of a "crystalline substance" and a "black tarry substance"; a credit card inside of Morrison's wallet belonging to "Dasia Dunn" along with about $590 in cash; two flashlights; some "bloody money" on the front passenger seat; dark clothing; a small guitar and clarinet; bolt cutters; and a security badge, among other items.

San Diego Police Officer Brett Crawford and his partner also responded to the call.  Officer Crawford activated his body camera before contacting any suspects.  A three-minute clip of the video from that camera was played for the jury.

Officer Crawford testified and the video showed that as he approached

the house, he came upon a silver car; that a car door was open; and that based on the shadows of the rear window of the car, it appeared to Officer Crawford that a subject was sitting in the right front passenger seat inside the car. The subject was later identified as Morrison. Officer Crawford noticed the rear license plate to the car was concealed by a plastic bag.

Officer Crawford contacted B.L., who confirmed she heard *two* male voices inside her house. B.L. also told Officer Crawford she had a guest in the house. Officer Crawford called the guest (i.e., Veronica) on her cellphone and instructed her to lock the door and stay inside her room.

About 30 minutes after arriving at the scene, medical responders, who had been dispatched to treat Morrison for his hand laceration, contacted Officer Crawford. The medical responders reported that while they were treating Morrison, they saw a male laying in some bushes about two houses down the street. The man appeared unresponsive. Officer Crawford along with other officers approached the bushes and saw the man later identified as Hewitt. The man followed the commands of the officers.

Neighbor Jean McGowan testified she was awakened by her barking dogs about 6:00 a.m. on the day of the break-in. McGowan and her husband looked outside and saw police activity at B.L.'s house, located directly across the street. McGowan estimated that about a week or two before the break-in, B.L.'s house had been tented for termites. The afternoon before the break-in, McGowan and her husband noticed a "silver sedan-type car" at the "very top" of the cul-de-sac that looked similar to the car that they saw parked in the driveway of B.L.'s house on the morning of the break-in.

Deputy Sheriff Rick Ellington, a 38-year veteran of the San Diego County Sheriff's Department, testified that a typical dosage unit for a heroin-user was .05 grams; that using such measure, 3.2 grams of heroin was about 60 dosage units; and that, because the price of heroin had dropped because of supply and demand, 3.2 grams of heroin had a "street value" of around $150. Regarding the methamphetamine, Deputy Ellington testified that a typical dose for a methamphetamine user also was .05, or 20 doses, per gram; and that a gram of methamphetamine sold for about $40. Deputy Ellington opined it was "very" common for individuals who possess and use drugs to sell them as well in order to support their use.

Deputy Ellington opined that purchases of drugs over 3.5 grams, which he referred to as an "eight ball," strongly suggested the purchaser was going

to resell that drug.  In his experience, once that quantity of drugs is purchased, the buyer typically tells the dealer he or she is reselling the drug in order to obtain more drugs, in even larger quantities, in the future.

Deputy Ellington testified that the 3.2 grams of heroin could have been possessed for sale but that this amount was a "wobbler" because it also could be possessed for personal use.  With regard to the methamphetamine, he further testified (under an assumed hypothetical) that the 23.85 and 17.03 grams of this controlled substance found in two separate bags was possessed for sale given the "sheer quantity" of the drug.  That one or both of the individuals who possessed this drug (in the hypothetical) appeared under the influence of the drug did not change Deputy Ellington's opinion that this quantity of drug was possessed for sale because, as he noted, "oftentimes people that are involved in the sales of controlled substances are also users." Deputy Ellington's noted (in the assumed hypothetical) that possession of $590 in cash by one of the individuals in possession of the drugs further suggested the drugs were for sale.

Deputy Ellington also testified that, if one of the individuals (in the hypothetical) was separately found with 12.92 grams of methamphetamine in his or her possession, several empty plastic baggies and a scale disguised as a cellphone (on which a white residue was found), that individual would also be possessing the drugs for sale as opposed to for personal use.

Assuming a dose of methamphetamine was .05 grams, Deputy Ellington opined that the 12.92 grams found in the backpack belonging to Hewitt constituted about 258 dosage units; that the 23.85 grams found in Morrison's car was about 477 dosage units; and that the 17.03 grams (minus one gram for packaging), also found in the car, was about 326 dosage units. Based on these dosage units, Deputy Ellington opined defendants possessed the methamphetamine for sale and not for personal use.

ECF No. 13-4 at 4–12, *as modified by* ECF No. 13-6 at 1 (footnote omitted).

## II. PROCEDURAL HISTORY

On December 17, 2015, after a joint trial with his co-defendant, Terry Hewitt, a San Diego County jury found Petitioner guilty of first-degree burglary, Cal. Pen. Code § 459, possession of methamphetamine for sale, Cal. Health & Saf. Code § 11378, and possession of heroin, Cal. Health & Saf. Code, § 11350 (a).  As to the first-degree

robbery charge, the jury further found that the burglary was of an inhabited dwelling, Cal. Penal Code §§ 459 and 460, and that another person, other than an accomplice, was present in the residence during the commission of the robbery, Cal. Penal Code § 667.5(c)(21).  *See* Clerk's Tr. 222–26.  During the bifurcated court trial proceeding on the priors, Petitioner waived a trial by the court and admitted probation denial priors pursuant to Cal. Penal Code § 1203(e)(4), a first prison prior pursuant to Cal. Penal Code §§ 667.5(b) and 668, a first serious felony prior pursuant to Cal. Penal Code §§ 667(a)(1), 668, and 1192.7(c), and strike priors pursuant to Cal. Penal Code §§ 667(b)–(i), 1170.12, and 668.  *See* Clerk's Tr. 231–32.  On February 26, 2016, Petitioner was sentenced to twenty-five (25) years to life and five (5) years consecutive for the prior, for a total of thirty (30) years to life, along with concurrent sentences of six (6) years and 259 days. *See* Clerk's Tr. 233–35.

On direct appeal, Petitioner raised five claims of error, including the contention raised as part of Claim One here, that the trial court erred in failing to strike one of his prior conviction allegations and improperly found two strikes arose from the same set of circumstances.  *See* Doc. No. 13-1.  In an opinion issued on April 27, 2017, the California Court of Appeal ordered sentence modification to correct an error unrelated to the Claim One contention but otherwise affirmed Petitioner's judgment of conviction.  *See* Doc. No. 13-4.  On May 12, 2017, the state appellate court issued an order modifying the opinion with no change in judgment.  *See* Doc. No. 13-6.  Petitioner thereafter filed a petition for review in the California Supreme Court, raising several claims not presented here along with the Claim One allegation asserting trial court error in improperly finding two strikes arose from the same set of circumstances.  *See* Doc. No. 13-8.  On August 9, 2017, the California Supreme Court summarily denied the petition for review.  *See* Doc. No. 13-9.

On August 8, 2018, Petitioner filed a Petition for a Writ of Habeas Corpus in this Court raising three claims for habeas relief: (1) the trial court erred in failing to strike one of his prior conviction allegations and improperly found two strikes arose from the same

set of circumstances; (2) his trial counsel rendered ineffective assistance by failing to investigate Petitioner's competency or an insanity defense and failing to use an experienced and licensed expert witness, instead using an unlicensed, inexperienced and unprofessional expert witness; and (3) Petitioner's third strike sentence was significantly harsher than the pre-trial offer, Petitioner had no opportunity to accept the offer and was punished for exercising his right to trial. *See* Doc. No. 1 at 6–13. On August 13, 2018, the Court issued a Notice Regarding Possible Dismissal of Petition for Failure to Exhaust State Remedies in view of Petitioner's indication Claim Two was not exhausted and outlined several options to avoid dismissal on the Court's own accord. *See* Doc. No. 2. On October 19, 2018, *nunc pro tunc* to October 17, 2018, Petitioner filed a motion for stay and abeyance. *See* Doc. No. 4. On March 25, 2019, the assigned Magistrate Judge issued a Report and Recommendation, *see* Doc. No. 5, and on April 26, 2019, the Court adopted the R&R and denied the motion for stay and abeyance without prejudice, *see* Doc. No. 7.

On August 6, 2019, Respondent filed a motion to dismiss the petition based on Petitioner's failure to exhaust state court remedies with respect to Claim Two and lodged portions of the state court record. *See* Doc. Nos. 12, 13. On August 25, 2019, *nunc pro tunc* to August 18, 2019, Petitioner filed a response in opposition to the motion to dismiss, which included a renewed request for stay and abeyance. *See* Doc. No. 17. On December 23, 2019, the assigned Magistrate Judge issued a second R&R, recommending the Court deny Respondent's motion to dismiss and grant Petitioner's renewed request for stay and abeyance. (ECF No. 18.) In a February 5, 2020 Order, the Court adopted the R&R, denied Respondent's motion to dismiss, granted Petitioner's renewed request for stay and abeyance, and ordered the case stayed pending exhaustion of Claim Two. *See* Doc. No. 19.

On August 27, 2020, Petitioner filed a second state habeas petition in the San Diego Superior Court, alleging: (1) ineffective assistance of trial counsel for failing to investigate and present an affirmative defense concerning disassociation from reality/

methamphetamine induced psychosis; and (2) trial court error in imposing an unauthorized sentence with a related contention of ineffective assistance of counsel. *See* Doc. No. 33-10. On September 8, 2020, the state superior court issued a reasoned order: (1) denying the habeas petition for failing to state a prima facie case for relief; (2) concluding that Petitioner's ineffective assistance of counsel claims were procedurally barred because they could have been, but were not, previously raised on appeal and also failed on the merits; and (3) finding that Petitioner's unauthorized sentence claim was barred as having been previously raised and rejected and also failed for lack of merit. *See* Doc. No. 33-11. On October 21, 2020, Petitioner presented the same two claims to the California Court of Appeal in a state habeas petition. *See* Doc. No. 33-12. On October 26, 2020, the state appellate court denied the petition as untimely, found Petitioner's claim of ineffective assistance in connection with his unauthorized sentence claim was procedurally barred in part as previously raised and rejected on appeal to the extent he argued the prior convictions only constituted one strike and in part because the insufficient evidence aspect of his claim was based on a guilty plea on which he had waived the right to raise questions about the sufficiency of evidence, and found Petitioner failed to state a prima facie case for relief with respect to his claim of ineffective assistance of trial counsel in failing to investigate and present a defense of methamphetamine psychosis. *See* Doc. No. 33-14. On November 30, 2020, Petitioner filed a state habeas petition in the California Supreme Court, again raising these same two claims. *See* Doc. No. 33-15. On February 17, 2021, the California Supreme Court denied the petition, stating in full: "The petition for writ of habeas corpus is denied (See *In re Robbins* (1998) 18 Cal.4th 770, 780 (courts will not entertain habeas corpus claims that are untimely.).)" Doc. No. 33-16; *see also* Doc. No. 25 at 26.

On March 24, 2021, Petitioner filed a First Amended Petition. *See* Doc. No. 25. On June 28, 2021, Respondent filed an Answer and lodged portions of the state court record. *See* Doc. Nos. 32–33. On August 24, 2021, *nunc pro tunc* to August 20, 2021, Petitioner filed a motion for stay and abeyance in lieu of a Traverse. *See* Doc. No. 39.

### III. Petitioner's Claims

(1) That the trial court erred in subjecting Petitioner to an unauthorized sentence by improperly finding two strikes arose from the same set of circumstances and trial counsel rendered ineffective assistance of counsel for failing to investigate and obtain evidence concerning Petitioner's prior convictions and failed to discover this error, violating his federal right to due process and the effective assistance of counsel. *See* Doc. No. 25 at 5–7.

(2) That trial counsel rendered ineffective assistance of counsel by: (a) failing to investigate and present an affirmative defense to the burglary charge of insanity or lack of competency due to "methamphetamine induced psychosis;" (b) failing to procure and call a licensed, experienced and professional expert witness to testify as to that defense; (c) instead calling an inexperienced, unprofessional and unlicensed expert; and (d) failing to call Petitioner's wife to testify about his co-defendant taking advantage of Petitioner's condition, violating his federal right to the effective assistance of counsel. *See id.* at 18–24.

### IV. Discussion

As noted above, Respondents maintain habeas relief is unavailable because: (1) the ineffective assistance counsel aspect of Claim One is procedurally barred and in any event fails for lack of merit; (2) the trial court error aspect of Claim One is not cognizable on federal review and even to the extent it is cognizable, the state court rejection of the claim was reasonable and the Court is bound by the state court's interpretation and application of state law; (3) the first three contentions raised on Claim Two are procedurally barred and in any event, fail for lack of merit; (4) the fourth contention raised in Claim Two is unexhausted but in any event, fails for lack of merit; and (5) to the extent any claims rely on a new rule of constitutional law, relief is precluded under *Teague v. Lane*, 489 U.S. 288, 301 (1989). *See* Doc. No. 32 at 3–5. In lieu of a Traverse, Petitioner filed a motion for stay and abeyance for the purpose of exhausting state court remedies as to his Claim Two allegations concerning trial counsel's alleged failure to call

Petitioner's wife to testify about co-defendant Hewitt taking advantage of Petitioner's condition, as well as with respect to other unidentified unexhausted ineffective assistance of counsel claims.  *See* Doc. No. 39.

## A.   Affirmative Defenses and Procedural Issues

In addition to contending Petitioner's claims fail for lack of merit, Respondent raises four affirmative defenses, including: (1) the trial court error aspect of Claim One is not cognizable on federal review; (2) failure to exhaust state court remedies with respect to the fourth contention in Claim Two; (3) Petitioner's ineffective assistance claims, alleged as part of Claim One and in the first three contentions in Claim Two, are procedurally barred; and (4) to the extent any claims rely on a new rule of constitutional law, relief is precluded under *Teague v. Lane*, 489 U.S. 288, 301 (1989).  *See* Doc. No. 32 at 3–5.  The Court discusses both *Teague* and procedural default in the instant section, and will separately discuss cognizability and exhaustion in the discussion of Claim One and the fourth contention of Claim Two, respectively.

### 1.   *Retroactivity and* Teague

"Unless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced."  *Teague*, 489 U.S. at 316 (plurality opinion); *see also Stringer v. Black*, 503 U.S. 222, 227 (1992) ("Subject to two exceptions, a case decided after a petitioner's conviction and sentence became final may not be the predicate for federal habeas corpus relief unless the decision was dictated by precedent existing when the judgment in question became final.")  A new rule is one that "breaks new ground or imposes a new obligation on the States or the Federal Government" or one whose "result was not dictated by precedent existing at the time defendant's conviction became final."  *Teague*, 489 U.S. at 301.

The Supreme Court instructs "if the State does argue that the defendant seeks the benefit of a new rule of constitutional law, the court must apply *Teague v. Lane* before considering the merits of the claim."  *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994).

However, the Ninth Circuit has demurred from conducting a *Teague* analysis when the state references the defense "only in passing." *Arredondo v. Ortiz*, 365 F.3d 778, 781 (9th Cir. 2004) ("Normally we decline to address an issue that is simply mentioned but not argued . . . and we see no reason to depart from that practice in a habeas appeal.") (internal citation omitted).

Here, Respondents vaguely and generally posit Petitioner's claims may be barred by *Teague*, stating: "To the extent any of Morrison's claims rely upon a new rule of constitutional law, the non-retroactivity doctrine forecloses federal habeas relief because, at the time his convictions became final, existing precedent did not compel the result he now seeks," that "[n]one of the recognized exceptions to this doctrine apply to any of the claims," and "[r]elief based on retroactive application of a new rule of criminal procedure is foreclosed on collateral review." Doc. No. 32 at 5 (citations omitted); *see also* Doc. No. 32-1 at 31 (same). Because Respondent fails to advance any specific *Teague* argument with respect to the claims in the Petition, including failing to identify the new rule or rules Petitioner purportedly relies upon, the Court finds Respondents have not properly raised this affirmative defense. *See Arredondo*, 365 F.3d at 782 ("No true *Teague* argument having been made by the state in this case, we decline to conduct a *Teague* analysis on our own.") (*citing Caspari*, 510 U.S. at 389). As such, the Court refrains from a *Teague* analysis.

### 2. *Procedural Default*

A federal habeas court "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). "State rules count as 'adequate' if they are 'firmly established and regularly followed.'" *Johnson v. Lee*, 136 S.Ct. 1802, 1804 (2016), (quoting *Walker v. Martin*, 562 U.S. 307, 316 (2011)). "For a state procedural rule to be 'independent,' the state law basis for the decision must not be interwoven with federal law." *La Crosse v.*

*Kernan*, 244 F.3d 702, 704 (9th Cir. 2001) (first citing *Michigan v. Long*, 463 U.S. 1032, 104–41 (1983); and then citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

Respondents note that "[t]he California Supreme Court denied on procedural grounds the petition presenting the ineffective assistance of counsel claims alleged in Ground One, and in sub-claims (a) through (c) of Ground Two," and asserts the bar "forecloses consideration of the claims on the merits." Doc. No. 32-1 at 31. Respondents further contend that the procedural bar imposed by the state court, in this case the timeliness bar, is adequate and independent, *see id.* at 31–34, and Petitioner does not appear to contest this assertion. In any event, the United States Supreme Court has found California's timeliness bar to be both adequate and independent. *See Martin*, 562 U.S. at 317; *see also id.* at 321 ("[W]e find no inadequacy in California's timeliness rule generally or as applied in [Petitioner's] case.").

Thus, federal review of Petitioner's defaulted ineffective assistance of counsel claims appears barred unless he can satisfy the cause and prejudice standard or demonstrate a fundamental miscarriage of justice will occur if the Court does not consider his claims. *See Coleman*, 501 U.S. at 750 ("In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.").

Because Petitioner's defaulted claims allege ineffective assistance of trial counsel, a prospective cause and prejudice analysis is also further complicated by the Supreme Court's decision in *Martinez v. Ryan*, 566 U.S. 1 (2012). In *Martinez*, the Supreme Court held that in some situations, the ineffective assistance of state collateral review counsel or lack of such counsel could serve as "cause" to excuse a procedural default of certain claims, stating: "Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar

a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* at 17. Because Petitioner had no counsel during his state habeas proceedings, *Martinez* appears to apply to his defaulted ineffective assistance of counsel claims. Petitioner could therefore demonstrate "cause" by demonstrating that the defaulted claims are "substantial," that is, the claims have "some merit." *Id.* at 14. Such an analysis would clearly require at least some inquiry into the merits of Petitioner's ineffective assistance of trial counsel claims.

However, a reviewing court may choose to instead address the merits when it proves simpler than addressing procedural matters and makes no difference to the outcome. *See, e.g.*, *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same.") (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)) ("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be."). The Court finds addressing the merits to be the more efficient course of action, particularly because as discussed below, Petitioner's defaulted ineffective assistance of counsel contentions raised in Claims One and Two fail under even a de novo review and Petitioner is not entitled to habeas relief regardless of the outcome of a procedural default analysis, which again in this instance would require at least some inquiry into the merits of Petitioner's defaulted claims. *See Franklin*, 290 F.3d at 1232 (citing *Lambrix*, 520 U.S. at 525); *see also Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) ("Courts can, however, deny writs of habeas corpus under § 2254 by engaging in de novo review . . . because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review, see § 2254(a).").

**B.      Addressing the Merits**

      *1.      Standard of Review*

      A state prisoner is not entitled to federal habeas relief on a claim that the state court adjudicated on the merits unless the state court adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Harrington v. Richter*, 562 U.S. 86, 97–98 (2011) (quoting 28 U.S.C. § 2254(d)(1)-(2)).

      A decision is "contrary to" clearly established law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  A decision involves an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Id.*; *Bruce v. Terhune*, 376 F.3d 950, 953 (9th Cir. 2004).  With respect to section 2254(d)(2), "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable–a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).  "State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Rice v. Collins*, 546 U.S. 333, 338-39 (2006) (quoting 28 U.S.C. § 2254(e)(1)).

      "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  "If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court

relitigation of claims already rejected in state proceedings. . . . It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Richter*, 562 U.S. at 102.

In a federal habeas action, "[t]he petitioner carries the burden of proof." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002)) (per curiam).  However, "[p]risoner pro se pleadings are given the benefit of liberal construction." *Porter v. Ollison*, 620 F.3d 952, 958 (9th Cir. 2010) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)) (per curiam).

With respect to Petitioner's allegations of ineffective assistance of counsel raised in both Claims One and Two, clearly established federal law provides "a defendant must show both deficient performance by counsel and prejudice in order to prove that he has received ineffective assistance of counsel." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).  "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).  "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88.  Additionally, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689.  To demonstrate prejudice, a petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.  "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

1

2.      *Claim One*

2

In Claim One, Petitioner contends the trial court erred in subjecting him to an

3

unauthorized sentence, as the two strike priors found in his case arose from the same set

4

of circumstances committed at the same time rather than on two separate days, violating

5

his rights under *People v. Vargas*, 59 Cal. 4th 648 (2014) and his federal due process

6

rights, citing *Hicks v. Oklahoma*, 447 U.S. 343 (1980).  *See* Doc. No. 25 at 5–7.

7

Petitioner also alleges trial counsel rendered ineffective assistance in failing to investigate

8

his priors.  *See id.*

9

a.      Allegations of Trial Court Error

10

Petitioner raised this aspect of Claim One in a petition for review in the California

11

Supreme Court and the California Supreme Court's denial was without explanation.  *See*

12

Doc. Nos. 13-8, 13-9.  The United States Supreme Court has repeatedly stated that a

13

presumption exists "[w]here there has been one reasoned state judgment rejecting a

14

federal claim, later unexplained orders upholding that judgment or rejecting the same

15

claim rest upon the same ground."  *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see*

16

*also Wilson v. Sellers*, 138 S.Ct. 1188, 1193 (2018) ("We conclude that federal habeas

17

law employs a 'look through' presumption.").  Given the lack of any record evidence or

18

argument attempting to rebut this presumption, the Court will "look through" the

19

California Supreme Court's summary denial to the reasoned opinion issued by the state

20

appellate court with respect to the alleged trial court error aspect of Claim One.  *See Ylst*,

21

501 U.S. at 804 ("The essence of unexplained orders is that they say nothing.  We think

22

that a presumption which gives them *no* effect-which simply 'looks through' them to the

23

last reasoned decision-most nearly reflects the role they are ordinarily intended to play.")

24

(footnote omitted).  The California Court of Appeal reasoned and held as follows:

25

26

Morrison alone contends the court erred in failing to treat his two priors
stemming from an offense in mid-February 2007 as a single prior.  Pursuant
to Morrison's probation report, in case No. SCD204961 Morrison entered a
house rented by the victim, "removed computer parts from the residence and

27

28

set the house on fire," causing $200,000 in damage. In late February 2007, officers contacted Morrison in his car and with his consent, searched the car and found among other items "computer components later identified as belonging to (the victim)." The probation report states Morrison pleaded guilty to count 1, first degree burglary (§ 460) and to count 2, arson (§ 451, subd. (b)). As a result, Morrison was sentenced to eight years in state prison in connection with these offenses. In sentencing Morrison in the instant case to an indeterminate term of 25 years to life, the court found there were two strike priors and one serious felony prior stemming from case No. SCD204961.

Morrison relies on our high court's decision in *People v. Vargas* (2014) 59 Cal.4th 635 (*Vargas*) in contending his two prior strike offenses must be treated as a single strike. In *Vargas*, our high court held that two prior convictions arising out of a single act against a single victim could not constitute two strikes under the "Three Strikes" law. (*Id.* at p. 637.) There, the defendant had two prior strikes—carjacking and robbery—which were based on the same *act* of taking the victim's car by force. (*Id.* at p. 645.) The trial court in *Vargas* counted each prior conviction separately and sentenced the defendant to prison for 25 years to life.

In reversing, *Vargas* concluded that the defendant's case fell into a "rare category" because the defendant's "two strikes were based on the same act." (*Vargas*, *supra*, 59 Cal.4th at p. 642, italics added.) The court further concluded that treating such a defendant "as a third strike offender( ) was inconsistent with the intent underlying both the legislative and initiative versions of the Three Strikes law." (*Id.* at p. 645.) The court explained the "voting public would reasonably have understood the 'Three Strikes' baseball metaphor to mean that a person would have three chances—three swings of the bat, if you will—before the harshest penalty could be imposed. The public also would have understood that no one can be called for two strikes on just one swing." (*Id.* at p. 646.)

The *Vargas* court noted it previously had held in *People v. Benson* (1998) 18 Cal.4th 24 (*Benson*) that even when a defendant's "previous two crimes could not be separately punished at the time they were adjudicated because they were committed during the same course of conduct (§ 654), . . . such close factual and temporal connection did not prevent the trial court from later treating the two convictions as separate strikes when the (defendant) reoffended." (*Vargas*, *supra*, 59 Cal.4th at p. 638.) The *Vargas* court recognized *Benson* had posed, but not decided, the issue then before it in

*Vargas*: "'Because the proper exercise of a trial court's discretion under section 1385 necessarily relates to the circumstances of a particular defendant's current and past criminal conduct, we need not and do not determine whether there are some circumstances in which *two prior felony convictions are so closely connected—for example, when multiple convictions arise out of a single act by the defendant as distinguished from multiple acts committed in an indivisible course of conduct—that a trial court would abuse its discretion under section 1385 if it failed to strike one of the priors.*' (*Benson*, *supra*, at p. 36, fn. 8, italics added.)" (*Vargas*, at p. 643.)

Here, the record shows Morrison in 2007 pleaded guilty in case No. SCD204961 to the separate offenses of first degree burglary and arson. Although the record shows both offenses occurred on the same day, involved the same victim and occurred as a result of a single entry into the house, the record shows defendant's two convictions did not involve a single act, as was the case in *Vargas* (*Vargas*, *supra*, 59 Cal.4th at p. 642), but rather involved multiple acts—entry with intent to commit a felony, the stealing of computer equipment that was later found in Morrison's car, and setting the house ablaze—all committed in an indivisible course of conduct, as was the case in *Benson*. (See *Benson*, *supra*, 18 Cal.4th at p. 36, fn. 8.)  As such, we conclude Morrison is not entitled under *Vargas* to have his two strike priors in case No. SCD204961 treated as a single strike.

Morrison alternatively contends the court abused its discretion when it refused to strike one of his strike priors in the "furtherance of justice." (§ 1385, subd. (a); *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*).)  In deciding a *Romero* motion, a court balances the constitutional rights of the defendant and the interests of society by considering (1) the nature of the past and present convictions and (2) evidence of the defendant's future prospects, background, and character.  (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)  The Three Strikes law "creates a strong presumption that any sentence that conforms to (its) sentencing norms is both rational and proper." (*Id.* at p. 378.)  As a result, "a trial court will only abuse its discretion in failing to strike a prior felony conviction . . . in limited circumstances," such as where it "was not 'aware of its discretion' to dismiss" or where "'the sentencing norms (of the Three Strikes law) produce( ) an "arbitrary, capricious(,) or patently absurd" result' under the specific facts of a particular case." (*Ibid.*)

Here, the record shows the court was not only aware of its discretion to strike one of Morrison's strike priors but also properly exercised it in denying

his *Romero* motion.   The record shows at sentencing, Morrison's counsel argued at length that Morrison had struggled with drug addiction since he was 12 years old.

The record also shows that in 1992, when Morrison was a juvenile, true findings were made on the charges of burglary and tampering with a vehicle; that he was convicted in 2000 of burglary and possession of a controlled substance; that he was convicted in 2000 of driving without a license; that in 2001, he was convicted of burglary stemming from an incident in Payson, Arizona; that also in 2001, he was convicted for fraudulent use of a credit card and theft of credit card by fraudulent means; that in 2008, he pleaded guilty (as noted) to first degree burglary and arson arising from the incident in February 2007; that when Morrison was contacted in 2007 in connection with that case, police found in his car: tools, duct tape, rope, binoculars, an M-80 explosive, a roll of black fuse cord, a shotgun and shotgun shells, latex rubber gloves, computer components (belonging to the victim, as noted), two "walkie talkies," methamphetamine, needles and a large amount of marijuana, among other items; and that also in early 2008, he pleaded guilty to burglary and grand theft—firearm, after police in July 2007 separately contacted him, searched his car and found, among other items: a hidden rifle, numerous tools, electronic equipment, gloves, a wig, a knife made with a blade attached to a screwdriver, a computer bag with 44 separate housing keys from San Diego State University and a pellet gun.

The record shows after reviewing the briefs filed by the parties, and listening to a prepared statement read by Morrison and the argument of counsel, the court denied Morrison's *Romero* motion.   In so doing, the court found that Morrison's future prospects were "very -- very bleak"; that society had a right to protect itself from his continuing criminal behavior; and that the crime of arson in 2007—one of Morrison's strike priors—was a "very scary part of this" behavior.   The court noted, "His (i.e., Morrison's) affinity with weapons, he's constantly being found with weapons, ammunition, burglary tools, disguises. I just think society has the right at this point in his life of continued criminality to protect itself.  I think he represents a very significant danger to society.  (¶) . . . I think any reasonable judge is going to believe he is extremely dangerous. Society needs to be protected from him."

Thus, the record clearly shows the court weighed Morrison's character, background and future prospects against his lengthy criminal record in concluding Morrison did not fall outside the spirit of the Three Strikes law. We therefore conclude the court properly exercised its discretion in declining

1  to strike under *Romero* one of Morrison's strike priors.

2

3  Doc. No. 13-4 at 26–31 (footnote omitted).

4      Petitioner also raised the *Hicks* argument in both the state appellate and state

5  supreme courts. *See* Doc. Nos. 13-1 at 36–37 and 13-8 at 23–24. Neither the state appellate

6  court in its reasoned decision rejecting Claim One on the merits, nor the state supreme

7  court in its summary disposition, addressed the *Hicks* argument. *See* Doc. Nos. 13-4 and

8  13-9. The Supreme Court has held that "[w]hen a federal claim has been presented to a

9  state court and the state court has denied relief, it may be presumed that the state court

10  adjudicated the claim on the merits in the absence of any indication or state-law procedural

11  principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). The Supreme

12  Court later held that: "Although *Richter* itself concerned a state-court order that did not

13  address any of the defendant's claims, we see no reason why the *Richter* presumption

14  should not also apply when a state-court opinion addresses some but not all of a defendant's

15  claims." *Johnson v. Williams*, 568 U.S. 289, 298 (2013). Here, because Petitioner

16  presented his *Hicks* argument to the state court, the Court presumes the state court also

17  rejected this argument on the merits.

18      Respondents assert this claim is not federally cognizable and maintains "to the extent

19  Morrison contends in Ground One that the trial court erroneously applied California law in

20  treating his two prior convictions as two strikes, rather than one (ECF No. 25 at 5-6),

21  federal habeas corpus relief is unavailable." Doc. No. 32-1 at 26. Respondent correctly

22  observes Petitioner's challenge to the correctness of the state court's conclusion Petitioner

23  was not entitled to have his two strike priors treated as a single strike under *Vargas* is not

24  cognizable on federal habeas review because it is based entirely on the interpretation and

25  application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not

26  the province of a federal habeas court to reexamine state-court determinations on state-law

27  questions."); *see also Rhoades v. Henry*, 611 F.3d 1133, 1142 (9th Cir. 2010) ("[V]iolations

28  of state law are not cognizable on federal habeas review.") Indeed, the "[Supreme Court]

ha[s] repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *McGuire*, 502 U.S. at 67-68); *see also Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).

The Court recognizes a petitioner's contention that the trial court's sentencing decision in his or her case violated his or her federal constitutional rights could prove cognizable on federal habeas review, as a state court sentencing error can rise to a federal claim if the state court decision was "so arbitrary or capricious" that it "constitute[d] an independent due process . . . violation." *Richmond v. Lewis*, 506 U.S. 40, 50 (1992) ("[T]he question to be decided by a federal court on petition for habeas corpus is not whether the state sentencer committed state-law error," but instead, whether the state court decision was "'so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation.'") (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1994)).  But mere mention of a federal constitutional guarantee such as due process cannot "transform" a state law issue into a claim of federal error.  *See, e.g.*, *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996) ("Langford may not, however, transform a state-law issue into a federal one merely by asserting a violation of due process.  We accept a state court's interpretation of state law, and alleged errors in the application of state law are not cognizable in federal habeas corpus.") (internal and external citations omitted).  The Court must construe Petitioner's contentions liberally.  *See Porter*, 620 F.3d at 958 (citing *Erickson*, 551 U.S. at 94).  Even so, Petitioner fails to persuasively explain how the state court's conclusion that *Vargas* was not applicable to his case was "arbitrary or capricious" such that it could potentially constitute an independent federal due process violation.

Petitioner relies on *Hicks* to assert the state court's errors in applying state law violated his federal due process rights, specifically asserting the trial court and prosecutor each erroneously noted the prior convictions were committed on two different dates rather than on the same day and time and "[t]he trial court having the correct information about the prior convictions would have proved that the burglary/arson are one, not two strikes."

Doc. No. 25 at 7 (citing *Hicks*, 447 U.S. at 346–47).  As Respondent correctly observes, *see* Doc. No. 32-1 at 48, while the trial court initially indicated a belief the two offenses were committed on separate days, trial counsel and the prosecutor clarified the residential burglary and arson were committed on the same day.  After the trial court asked: "His two priors, what, were several days apart?", the following exchange took place:

|  |  |
|---|---|
| [Counsel]: | That was actually one case, and they were the same day, which was one of the reasons -- |
| The Court: | Was the report in error, then? I read the report that it was not on the same day; they were several days apart. |
| [Prosecutor]: | No, that's actually incorrect.  It's a res burg, and then the car is found with all of that stolen property and the gun. |
| The Court: | So that -- |
| [Prosecutor]: | Actually -- |
| The Court: | That -- |
| [Counsel]: | There's two separate dates as far as that case is -- February of 2010. |
| The Court: | Well, it's the same -- |
| [Prosecutor]: | The arson and the res burg that he's convicted of is from the res burg and the arson at the house.  But there's two separate dates, yes. |
| The Court: | Okay. |
| [Counsel]: | So, your Honor, we're suggesting that it actually was -- the res burg and the arson, which are the two strike priors, were the same day, the same case. |
| The Court: | I didn't read the probation report that way.  But -- |

| | | |
|---|---|---|
| [Prosecutor]: | Because there was an additional date -- |
| The Court: | Right. |
| [Counsel]: | It can be confusing, because then he committed another offense while out on bail.  So when the -- |
| The Court: | Okay.  Maybe that's what -- while he was out on bail, he committed yet another offense. |
| [Prosecutor]: | Yes. |
| The Court: | All right.  Maybe that's what I had in mind. |

Doc. No. 33-8 ("Reporter's Tr.") 2039–41.

The trial court's initial misapprehension that the offenses occurred on two different days was promptly corrected.  The state appellate court also correctly observed the two offenses at issue took place on the same day, but nevertheless concluded the two offenses constituted multiple acts.  *See* Doc. No. 13-4 at 28–29 ("Although the record shows both offenses occurred on the same day, involved the same victim and occurred as a result of a single entry into the house, the record shows defendant's two convictions did not involve a single act, . . . but rather involved multiple acts—entry with intent to commit a felony, the stealing of computer equipment that was later found in Morrison's car, and setting the house ablaze—all committed in an indivisible course of conduct, . . .").  Because the trial court's initial mistake was corrected during the exchange with counsel and the state appellate court explicitly and correctly recognized the two offenses occurred on the same day, Petitioner fails to demonstrate the initial confusion had any impact on the finding of two prior strikes, rather than one.  In any event, as discussed above, the state court's determination that *Vargas* was not applicable to Petitioner's case, which again was based on the appellate court's correct understanding the two offenses occurred on the same day, is binding on this Court.  *See Bradshaw*, 546 U.S. at 76 ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the

challenged conviction, binds a federal court sitting in habeas corpus.") (citing *McGuire*, 502 U.S. at 67–68); *see also Mullaney*, 421 U.S. at 691.

Petitioner fails to demonstrate it was "arbitrary or capricious" for the state court to reject his contention that his two prior strikes should be treated as one strike or that its decision was incorrect, much less fundamentally unfair. *See Richmond*, 506 U.S. at 50 (quoting *Lewis*, 497 U.S. at 780); *see also Christian v. Rhode*, 41 F.3d 461, 469 (9th Cir. 1994) ("Absent a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify federal habeas relief."). Because Petitioner fails to show the state court decision was either contrary to, or an unreasonable application of, clearly established federal law or that the state court decision was based on an unreasonable factual determination, federal habeas relief is not available on this aspect of Claim One. *See* 28 U.S.C. § 2254(d)(1)–(2); *see also Richter*, 562 U.S. at 97–98.

### b.    Allegation of Ineffective Assistance of Counsel

Petitioner also alleges trial counsel rendered ineffective assistance in failing to investigate his priors, contending trial counsel "was totally informed that the prior burglary, was not a burglary, but intentional arson" and was told the computer parts found were not from the victim's residence but were instead from Petitioner's own home computer. *See* Doc. No. 25 at 6–7. Petitioner asserts had trial counsel investigated, "the prior conviction would be one strike- arson." *Id.* at 7.

Petitioner raised this claim in a state habeas petition in the California Supreme Court, which the state court denied, stating in full: "The petition for writ of habeas corpus is denied (See *In re Robbins* (1998) 18 Cal.4th 770, 780 (courts will not entertain habeas corpus claims that are untimely.).)" Doc. Nos. 33-15, 33-16. As discussed above, the Court will review this claim on the merits despite the state court's procedural ruling because the claim fails under even a de novo review.

Again, "a defendant must show both deficient performance by counsel and prejudice in order to prove that he has received ineffective assistance of counsel." *Mirzayance*, 556 U.S. at 122 (citing *Strickland*, 466 U.S. at 687). While Petitioner alleges trial counsel knew

the computer parts ostensibly stolen from the victim's apartment were not from that residence, but were instead Petitioner's, the record does not reflect whether or to what extent counsel investigated this assertion.   Even assuming Petitioner was able to demonstrate trial counsel acted in a deficient manner in failing to investigate his prior convictions, the contention would still fail for lack of prejudice. *See Strickland*, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

Petitioner contends a proper investigation of his priors would have shown the burglary was not a burglary and Petitioner only committed arson.   However, the record reflects Petitioner pled guilty to both burglary and arson, in violation of Cal. Penal Code §§ 459/460 and 451(b), respectively. *See* Doc. No. 33-13 at 180–82.   In pleading guilty to the burglary, Petitioner explicitly admitted he "unlawfully entered a building with intent to commit theft." *Id.* at 182.   While Petitioner now asserts there was no burglary because nothing was taken from the victim's residence, he admits in both the instant Petition and in a declaration attached to his superior court habeas petition that he committed intentional arson when he set the victim's residence on fire after entry. *See* Doc. No. 25 at 6 (in which Petitioner asserts he told trial counsel "the prior burglary, was not a burglary, but intentional arson," that "nothing was taken" and he "lit the Sharpe residence on fire"); *see also* ECF No. 33-13 at 59 (in which Petitioner declared in relevant part: "I do recall, the strike - burglary, I've known Mr. Sharpe, the focus and/or intent was to burn his house, I knew, that Mr. Sharpe would not be in the house, therefore it burned").

As Respondents reasonably point out, in California, burglary does not require taking but instead only requires entry with the intent to commit any felony. *See* Doc. No. 32-1 at 51 (citing Cal. Penal Code § 459) ("Every person who enters any house, room, apartment, . . . or other building, . . . when the doors are locked, . . . with intent to commit grand or

petit larceny *or any felony* is guilty of burglary.") (emphasis added).  In California, arson is a felony.  *See* Cal. Penal Code § 451(b) ("A person is guilty of arson when he or she willfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels, or procures the burning of, any structure, forest land, or property. . . . (b) Arson that causes an inhabited structure or inhabited property to burn is a felony punishable by imprisonment in the state prison for three, five, or eight years.").  As such, Petitioner fails to show how trial counsel could have somehow prevented the burglary conviction from being considered because of the alleged lack of theft, given Petitioner's guilty pleas to both arson and burglary, as well as Petitioner's express admission he entered the victim's residence for the purpose of arson.  Thus, even if Petitioner can somehow show trial counsel acted deficiently in failing to investigate the ownership of the computer parts, the Court finds no possibility of prejudice.  *See Mirzayance*, 556 U.S. at 122 ("[A] defendant must show both deficient performance by counsel and prejudice in order to prove that he has received ineffective assistance of counsel.") (citing *Strickland*, 466 U.S. at 687).  Petitioner's claim of ineffective assistance of counsel for failing to investigate his priors fails on the merits under even a de novo review.  Habeas relief is not warranted.

> 3. *Claim Two (a) through (c)*

In Claim Two (a) through (c), Petitioner asserts trial counsel rendered ineffective assistance in (a) failing to investigate and present an affirmative defense to the burglary charge of insanity or lack of competency due to methamphetamine induced psychosis, including (b) failing to procure and call a licensed, experienced and professional expert witness to testify as to that defense, and (c) instead calling an inexperienced, unprofessional and unlicensed expert.  *See* Doc. No. 25 at 18–24.

Petitioner raised these contentions in a state habeas petition in the California Supreme Court, which the state court denied, stating in full: "The petition for writ of habeas corpus is denied (See *In re Robbins* (1998) 18 Cal.4th 770, 780 [courts will not entertain habeas corpus claims that are untimely.].)"  Doc. Nos. 33-15, 33-16.  As discussed above, the Court will review these arguments on the merits despite the state court's procedural

ruling, because these three contentions fail under even a de novo review.

At trial, the defense contended there was reasonable doubt as to Petitioner's intent to commit burglary in view of his methamphetamine use on the evening of the crimes. *See, e.g.*, Reporter's Tr. 884 ("Let's talk about reasonable doubt because that is the entire point of why you're here. That's it. It's reasonable doubt."); Reporter's Tr. 886 ("You're here to determine if you can be sure, beyond a reasonable doubt, what was going on in his head, what was his intention."); Reporter's Tr. 889) ("The guy is on meth. We are not talking -- when we talk about reasonable doubt, we're not talking about whether his actions that day were reasonable. They were not. They were the actions of a person who was on a several-day bender, using -- injecting methamphetamine, and probably not sleeping too much."); Reporter's Tr. 894 ("We're here to determine if when he walked into that home he had the intention to take things. . . Whether he was intending to steal things or if he was just picking things up, opening things, throwing things around. That's what you're here to determine, what was in his head, not whether you like him, none of those things."); Reporter's Tr. 897 ("There was a woman screaming. He was out walking and jogging in a cape. Can you be reasonably sure -- can you be sure beyond a reasonable doubt that he walked into that home to steal things?").

To this end, counsel elicited testimony and other evidence from several witnesses about Petitioner's behavior and physical state on the night of the burglary. Petitioner's friend and fellow drug user Adrian Hadfield testified Petitioner "does more [drugs] than anybody I've seen do," stating: "I've seen him paranoid. I've seen him hallucinating. I've seen him talk to himself, talk to people that aren't even there." Reporter's Tr. 766–67. Hadfield testified he saw Petitioner shoot up about 1.2 grams of methamphetamine that evening and added that Petitioner acted "crazy" that evening even before injecting the drugs, behavior Hadfield had previously seen when a person had been awake a week. Reporter's Tr. 770–72. Meanwhile, the transcript from Officer Bernard's body camera on the night of the crimes reflected that when the officer asked Petitioner if he was high, Petitioner replied: "I'm on a mixture of Niacin, Benzaytine and other different

medications," and later added: "I'm on Niacin . . . Adderall . . ." Doc. No. 33-1 at 99, 105. Officer Bernard had "lucid conversations" with Petitioner, stating: "He rambled a little bit about some things, but for the most part we were able to talk and have a fairly normal conversation, considering the circumstances." Reporter's Tr. 608, 612.   When asked if Petitioner exhibited symptoms of being under the influence, Bernard testified: "He was exhibiting some.   I'd say he was middle of the road." Reporter's Tr. 613.   Officer Worthington, who had previously worked in the medical field, took Petitioner's pulse during the arrest and found he had an "elevated" pulse of 132 despite the fact that Petitioner was sitting and handcuffed. Reporter's Tr. 228. Worthington noted Petitioner's eyes were dilated and performed a test by asking him to close his eyes, count to 30 and open them; Petitioner made it to about 14 or 16 seconds and his eyes fluttered. Reporter's Tr. 230–31. When asked if Petitioner was under the influence of methamphetamine, Worthington stated: "Of some type of stimulant, yes." Reporter's Tr. 231.

The defense also called Arthur Fayer as an expert witness to testify about Petitioner's addiction to methamphetamine, his ingestion of drugs that evening and the effects of methamphetamine use.   Fayer, a certified addiction specialist, had worked in the field for 28 years, was himself a recovering drug addict close to 32 years sober, and had been retained as an expert in 60 San Diego County cases, with 20 settling prior to trial and 40 cases in which he testified in court as an expert. Reporter's Tr. 625–28, 657.   Fayer stated that he arrived at his opinion about Petitioner's addiction based on a custodial interview using a diagnostic test and a structured interview, and he also reviewed the case discovery. Reporter's Tr. 634.   Fayer found it "possible" that the large amount of drugs Petitioner had on his person at the time of arrest was for Petitioner's personal use, while acknowledging it was "an unusual amount." Reporter's Tr. 635.   Looking at lab results, Fayer stated "this was a highly -- we can't say addicted, but at the time of the test, had a lot of drugs in him, a lot of methamphetamine." Reporter's Tr. 640.   Fayer opined the lab results reflected Petitioner had built up a significant drug tolerance, stating: "That is why we would then say this is an addicted person because what I saw, the numbers that I saw for the defendant

were such that if I had that number, it would have killed me now because I don't do any." Reporter's Tr. 640.    Fayer also testified about several of the side effects of methamphetamine use, including teeth destruction known as "meth mouth," skin flushing and scratching, the stimulant effect that kept a user awake for long periods of time, visual and aural hallucinations as well as resulting paranoia and irrational, hyperactive and aggressive behavior, and motor mouth including talking non-stop to others, themselves, or no one at all.  Reporter's Tr. 641–43.

As this Court "must indulge a strong presumption that counsel's conduct," it is clear trial counsel's decision to present a reasonable doubt defense to the burglary based on Petitioner's lack of intent due to methamphetamine intoxication "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.  Petitioner fails to overcome the "strong presumption" that trial counsel's actions were reasonable, particularly given counsel procured and presented an expert witness in support of the proffered defense who testified Petitioner was an addict, had injected a significant amount of drugs on the night of the crimes, and described the multitude of potential side effects from such drug use, including numerous behaviors Petitioner exhibited that evening.  *Id.*; *see also Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998) ("[T]he relevant inquiry under *Strickland* is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable.").

While Petitioner now contends trial counsel should have investigated and presented a defense of insanity or lack of competency due to methamphetamine induced psychosis, Petitioner first fails to show that such a defense was even viable.  As Respondent points out, "California law abolished the diminished capacity defense in 1982" and "under California law, an insanity defense cannot be based solely on 'an addiction to, or abuse of, intoxicating substances.'" Doc. No. 32-1 at 55 (quoting Cal. Penal Code § 29.8).  Petitioner also fails to offer evidence showing he actually suffered from methamphetamine induced psychosis at the time of the crimes, much less that trial counsel was or should have been aware of such but failed to take appropriate action.  The Supreme Court has specifically

cautioned reviewing courts from engaging in such retrospection, particularly without any evidence or indication counsel was or should have been aware of the need for the asserted investigation.  *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

Petitioner's contentions appear rooted in the fact that the chosen defense was ultimately unsuccessful, but this does not mean the defense was unreasonable or that trial counsel's performance fell below constitutional guarantees.  *See Cox v. Ayers*, 613 F.3d 883, 893 (9th Cir. 2010) ("A disagreement with counsel's tactical decisions does not prove that the representation was constitutionally deficient.") (citing *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981)) (per curiam); *see also Strickland*, 466 U.S. at 689 ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proven unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.").

In addition to failing to establish trial counsel acted deficiently, Petitioner also fails to demonstrate any possibility of prejudice.  Again, Petitioner fails to offer any evidentiary support that he suffered from methamphetamine induced psychosis or that such a defense was viable, much less demonstrate that advancing the defense could have resulted in a different verdict on the burglary charges.  *See Strickland*, 466 U.S. at 694 (to demonstrate prejudice, a petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").  Even if Petitioner were somehow able to demonstrate deficient performance arising from trial counsel's failure to pursue the asserted defense of methamphetamine induced psychosis and failure to call a licensed expert witness in accordance with that specific defense, the Court finds no possibility of prejudice.  *See Mirzayance*, 556 U.S. at 122 ("[A] defendant must show both deficient performance by counsel and prejudice in order to prove that he

1   has received ineffective assistance of counsel.") (citing *Strickland*, 466 U.S. at 687).

2      Petitioner also argues counsel should have called an expert witness but offers

3   nothing to support his contention that any such expert would have been available and

4   willing to testify Petitioner suffered from methamphetamine induced psychosis at the time

5   of the crimes.  Petitioner's failure to identify what type of expert trial counsel should have

6   called, apart from vaguely asserting the expert should have been "licensed, experienced,

7   and a professional expert witness," Doc. No. 25 at 23, in purported contrast to Fayer, and

8   Petitioner's accompanying failure to offer any indication what testimony or other evidence

9   such an expert could have provided, definitively obstructs any possible finding of

10  prejudice.  *See, e.g.*, *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) ("Speculation

11  about what an expert could have said is not enough to establish prejudice.").  Nor does

12  Petitioner show the testifying expert was inexperienced, unprofessional, or unlicensed.

13  Again, the record reflects Arthur Fayer was a certified addiction specialist who had worked

14  in the field for several decades, was himself a recovering drug addict, and had been

15  previously retained as an expert in scores of cases and testified in San Diego County courts

16  as an expert witness on dozens of prior occasions.  Reporter's Tr. 625–28, 657.

17     Based on the Court's review of the record and arguments presented, Petitioner's

18  claim of ineffective assistance of counsel for failing to investigate and present a defense of

19  methamphetamine induced psychosis, failing to call an appropriate expert, and instead

20  calling an inappropriate expert witness fails on the merits under even a de novo review.

21  *See Mirzayance*, 556 U.S. at 122; *Strickland*, 466 U.S. 689-90, 694.  Habeas relief is not

22  available on Claim Two (a) through (c).

23      *4.   Claim Two (d) and Renewed Request for Stay*

24     In Claim Two (d), Petitioner alleges trial counsel rendered ineffective assistance for

25  failing to call Petitioner's wife to testify about Petitioner's co-defendant taking advantage

26  of Petitioner's condition, and asserts his wife "would have given strong testimony to the

27  willingness of Terry Hewitt, to take advantage of most people weaker than himself."  Doc.

28  No. 5 at 24.  Respondent contends this claim is not exhausted but nonetheless fails for lack

of merit.  *See* Doc. No. 32-1 at 63.

In lieu of filing a Traverse, Petitioner has filed a motion for stay and abeyance for the purposes of exhausting his state court remedies.[3]  *See* Doc. No. 39.  With respect to Claim Two (d), Petitioner alleges "my wife's recollection and perception of the continuous disassociated sense of reality I exhibited is extremely relevant in proving prima facia in regards to [sic] my culpability and intent," and his wife is "in the process of obtaining hospital records" and "providing a detailed affidavit" on such matters.  *Id.* at 4.  "[A] state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus."  *Picard v. Connor*, 404 U.S. 270, 275 (1971); *see also* 28 U.S.C. §§ 2254(b) and 2254(c).  "[O]nce the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied."  *Picard*, 404 U.S. at 275.  Petitioner acknowledges in his request for stay and abeyance that Claim Two (d) is not exhausted.  *See* Doc. No. 39 at 3–4.  While relief may not be granted on an unexhausted claim, the Court may exercise discretion to deny a claim on the merits despite a petitioner's failure to fully exhaust state judicial remedies.  *See* 28 U.S.C. § 2254(b)(2); *Gatlin v. Madding*, 189 F.3d 882, 889 (9th Cir. 1999); *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir 2005) ("[A] federal court may deny an unexhausted petition on the merits only when it is perfectly clear that the applicant does not raise even a colorable federal claim.").

---

[3] In addition to Claim Two (d), Petitioner appears to impliedly reference having other unexhausted claims of ineffective assistance of counsel he wishes to present to the state court, in addition to possibly also seeking to re-present additional evidence in support of claims previously raised and denied in state court.  *See* Doc. No. 39 at 3–4 ("It would seem beneficial for me to include that 'attorney client privileged communication' letter along with the 'new' petitions for writ of habeas corpus relief I seek to submit to the state court for both the 'unexhausted' claims and also the previously denied petitions.  I feel that it is imperative in regards to the 'furtherance of justice' that I be granted a substantial and extended period of time 'exhaust' [sic] these claims of my 'ineffective assistance' of counsel.  This would also include sub-claim (d) of my federal habeas petition that is pending in your Court for case number 18-CV-01857.").  Yet, Claim Two (d) is the only unexhausted claim Petitioner has identified and indicates he seeks to present to the state court.  In view of Petitioner's failure to identify any other unexhausted claims he seeks to exhaust, the Court's *Rhines* analysis is necessarily limited to Claim Two (d).

Petitioner fails to explain how his wife's testimony is relevant to or can shed any light on his actions or intent on the night of the crimes. Petitioner instead generally alleges that his wife distrusted Petitioner's co-defendant Hewitt and believed he "could easily manipulate her husband" and "took full advantage of his condition," and asserts Hewitt took Petitioner's money and drugs and would inject less drugs than her husband to avoid vulnerability. Doc. No. 25 at 20–21. However, given the lack of any declaration or affidavit from Petitioner's wife, much less any indication she was privy to Petitioner's behavior or actions on the night in question, Petitioner fails to show how her testimony could have provided any evidence concerning Petitioner's or Hewitt's actions or intent that evening. Instead, the trial record reflects Petitioner and Hewitt were at the home of friend and fellow methamphetamine user Adrian Hadfield on the evening of the crimes, both injected a large quantity of drugs, and they left together; Hadfield did not indicate Petitioner's wife was present that evening. *See, e.g.*, Reporter's Tr. 770–72.

Even were Petitioner somehow able to show counsel acted deficiently in failing to call Petitioner's wife to testify about Petitioner's pattern or history of drug use and his prior interactions with Hewitt, he fails to demonstrate prejudice. *See Strickland*, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). Based on a review of the record and in particular the absence of any indication Petitioner's wife had any direct knowledge of the events in question, the events leading up to the crimes, or Petitioner and Hewitt's interactions that evening and whether they fit the earlier pattern she had observed, the Court is not persuaded there is any "reasonable probability" that but for trial counsel's failure to call Petitioner's wife as a witness, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Because the contention is clearly without merit, habeas relief is unavailable on Claim Two (d). *Cassett*, 406 F.3d at 624.

Turning to Petitioner's related request for stay and abeyance, in *Rhines v. Weber*, 544 U.S. 269, 273 (2005), the Supreme Court held that when presented with a mixed petition by a habeas petitioner, "a district court might stay the petition and hold it in abeyance while the petitioner returns to state court to exhaust his previously unexhausted claims." *Id.* at 275–77. Even so, the Court specifically instructed "stay and abeyance should be available only in limited circumstances" and was appropriate where: (1) "there was good cause for the petitioner's failure to exhaust his claims first in state court," (2) the "unexhausted claims are potentially meritorious" and (3) "there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." *Id.* at 277–78.

Petitioner makes little effort to substantiate his request for stay and abeyance under *Rhines*. He offers only a cursory reference to appellate counsel's representation and attaches a letter sent by counsel concerning claims raised on appeal but does not explain how this amounts to good cause for failing to previously exhaust Claim Two (d). *See* Doc. No. 39 at 3–4. In reviewing the history of this case, it is apparent a stay is not warranted. First, the Court already previously granted a stay and abeyance in this case for purposes of exhaustion, *see* Doc. No. 19, and Petitioner returned to state court to exhaust several contentions alleging ineffective assistance of counsel, namely Claim Two (a) through (c) and the ineffective assistance of counsel portion of Claim One, *see* Doc. Nos. 23, 24. Moreover, Petitioner utterly fails to explain why he was unable to raise Claim Two (d) in the recent state habeas petition, which was denied as untimely by the state court, and which also raises questions about the possibility the instant request for another stay and abeyance is for the purposes of delay. *See Rhines*, 544 U.S. at 277 ("Though, generally, a prisoner's 'principal interest ... is in obtaining speedy federal relief on his claims,' not all petitioners have an incentive to obtain federal relief as quickly as possible.") (quoting *Rose v. Lundy*, 455 U.S. 509, 520 (1982)) (plurality opinion).

In addition to Petitioner's failure to demonstrate good cause and the Court's concerns about intentional delay, it is also evident, as discussed above, Petitioner's allegation of ineffective assistance of trial counsel for failing to call his wife to testify is

without merit.  Accordingly, the Court **DENIES** Petitioner's request for stay and abeyance.

### V. CERTIFICATE OF APPEALABILITY

A petitioner may not appeal "the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court" except where "a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.

"A certificate of appealability should issue if 'reasonable jurists could debate whether' (1) the district court's assessment of the claim was debatable or wrong; or (2) the issue presented is 'adequate to deserve encouragement to proceed further.'" *Shoemaker v. Taylor*, 730 F.3d 778, 790 (9th Cir. 2013) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  This includes a district court's decision on a procedural issue. *See Buck v. Davis*, 137 S. Ct. 759, 777 (2017) ("[A] litigant seeking a COA must demonstrate that a procedural ruling barring relief is itself debatable among jurists of reason; otherwise, the appeal would not 'deserve encouragement to proceed further.'") (quoting *Slack*, 529 U.S. at 484).

The Court finds issuing a certificate of appealability is not appropriate as reasonable jurists would not find debatable or incorrect the Court's conclusion that (1) habeas relief is not warranted on the trial court error aspect of Claim One, (2) regardless of the outcome of a cause and prejudice analysis, habeas relief is not available on Claim Two (a) through (c) or the ineffective assistance of counsel aspect of Claim One because the claims fail under even a de novo review, (3) Claim Two (d) fails for lack of merit despite Petitioner's failure to exhaust and (4) stay and abeyance is not warranted, nor does the Court find any of the issues presented deserve encouragement to proceed further. *See* 28 U.S.C. 2253(c); *Slack*, 529 U.S. at 484.  Accordingly, the Court **DENIES** a certificate of appealability.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VI. Conclusion

For the foregoing reasons, the Court **DENIES** the First Amended Petition for a Writ of Habeas Corpus, **DENIES** Petitioner's motion for stay and abeyance, and **DENIES** a Certificate of Appealability.

**IT IS SO ORDERED**.

Dated:  October 1, 2021

HON. MICHAEL M. ANELLO
United States District Judge